IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| CHERYL BRUDER, | ) | Case No. 3:18-cv-0135 |
|---|---|---|
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OF OPINION** |
| SOCIAL SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Cheryl Bruder, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act ("Act"). The parties consented to my jurisdiction. ECF Doc. 13. Because substantial evidence supported the ALJ's decision and because Bruder has not identified any incorrect application of legal standards, the final decision of the Commissioner must be AFFIRMED.

## II. Procedural History

Bruder filed an application for Title II disability insurance benefits in April 2015 alleging a disability onset date of April 8, 2015. (Tr. 540). After her claim was denied initially (Tr. 362) and upon reconsideration (Tr. 381), Bruder requested a hearing. (Tr. 420-421). Administrative Law Judge ("ALJ") Paul Sher heard the case on January 24, 2017 (Tr. 301-357) and found Bruder not disabled in a April 17, 2017 decision. (Tr. 164-175). Bruder requested review of the

ALJ's decision on April 20, 2017 (Tr. 297) but the Appeals Council denied review on December 18, 2017, (Tr. 1-4) rendering the ALJ's decision final. Bruder instituted this action to challenge the Commissioner's final decision.

## III.   Evidence

### A.   Relevant Medical Evidence

Three months before the alleged onset date, x-ray images of Bruder's spine showed levoconvex scoliosis and hypertrophic changes, along with mild disc space narrowing from the L3 to the S1 discs. (Tr. 631). An MRI revealed mild posterior disc bulging at L3-L4 on the left and mild diffuse posterior disc bulging at L4-L5, with left lateral recess narrowing at L3-L4 and bilateral recess narrowing at L4-L5. The MRI also showed a large perineural cyst and expansion of the foramen on the T-12 disc of the thoracic spine. (Tr. 759).

On April 8, 2015, Bruder saw her primary care physician, Amy Browne, D.O. (Tr. 960). Bruder complained of low back pain radiating into her legs. (Tr. 960). Dr. Browne referred Bruder to neurosurgery and ordered a functional capacity examination. (Tr. 962).

Bruder saw Neurosurgeon Dale Braun on April 20, 2015. Bruder complained of low back pain radiating down both her legs, ankles and feet. She reported that standing, walking and sitting caused her pain. She also reported not being able to sleep due to the pain. (Tr. 754). Dr. Braun noted that there was no evidence of nerve impingement in her low back and that her pain was diffuse. He diagnosed intervertebral disc displacement lumbar without myelopathy; lumbar spondylosis without myelopathy; and lumbago. He opined that there were no surgical options and recommended pain management. (Tr. 755).

On May 1, 2015, Bruder followed up with Dr. Browne for depression. She reported ongoing depression that was stable with medication. (Tr. 1140). Dr. Browne diagnosed major

depressive disorder (single episode) and increased her dosage of Cymbalta. (Tr. 1141). Bruder returned for a follow-up visit on May 29, 2015. She reported increased anxiety and depression. Dr. Browne added Trazodone. (Tr. 987-988). Bruder also met with Dr. Browne for a depression follow-up appointment in July and called for a prescription refill in August 2015. (Tr. 1162, 1196).

On May 12, 2015, at Dr. Browne's request, Bruder underwent a functional capacity examination ("FCE") by physical therapist, Matthew Hamlin. Based on Bruder's performance, Mr. Hamlin concluded that she had used maximum effort and found the FCE to be valid. (Tr. 778, 779, 780). The FCE also indicated that Bruder's asserted pain levels and symptoms were reliable. (Tr. 781)

The FCE showed that Bruder's lower back range of motion was reduced by 50-75%. She had full range of motion in her cervical spine, but her ability to turn her head was limited due to pain. (Tr. 794). The FCE showed that Bruder was having difficulty standing for prolonged periods and frequently lost her balance. But, when sitting, she did not voice any changes in her pain symptoms. She was able to walk for 10 consecutive minutes at 1.0 mile per hour. (Tr. 783). She was unable to complete one of the tests because she could not walk at 2.0 miles per hour. (Tr. 784).

Bruder scored very low (zero percentile) on the turning test which indicated that she would have difficulty with job tasks requiring medium hand dexterity in a specified amount of time. (Tr. 782). She also scored in the zero percentile in a test measuring fine hand dexterity. (Tr. 782, 783). The FCE also indicated that she would have difficulty with job tasks challenging her balance. (Tr. 785). The FCE showed that Bruder was able to occasionally lift 10 pounds from the floor up to her waist. She was able to occasionally lift 15 pounds from her waist to her

shoulders. However, she was instructed to avoid lifting from her shoulders to overhead. (Tr. 786). Bruder's ability to push/pull fell in the "normal"– tenth percentile – range for individuals her age. (Tr. 787). Her ability to carry was also in the tenth percentile for age. (Tr. 788). However, the test was terminated due to the weight becoming too heavy for her to safely push and pull. (Tr. 787).

After administering the FCE, Mr. Hamlin concluded that Bruder would not be able to perform her previous job at the medium physical demand level. Bruder could frequently sit, but she could only occasionally perform all of her other functional activities. (Tr. 789). Her physical abilities matched the sedentary work exertional level. (Tr. 788).

In July 2015, Bruder underwent a psychological evaluation by Melissa K. Lanza, Ph.D. (Tr. 993-998). Dr. Lanza diagnosed an unspecified depressive disorder and found that this impairment affected Bruder's ability to concentrate and to cope with stress. (Tr. 997-998). Dr. Lanza noted that Bruder fatigued easily and required prompts to stay on topic. (Tr. 996). She opined that Bruder might continue to experience an increase in mental health symptoms in response to stressful situations, including work pressures, if she returned to work. (Tr. 998).

An x-ray of Bruder's chest on August 31, 2015 showed mild convexity of the mid and lower dorsal spine to the right with minimal degenerative changes. There was slight height loss of a mid/lower dorsal vertebral body, likely chronic. (Tr. 637). A CT scan taken the same day showed mild apical pleural thickening on the right and minimal pleural thickening in the left apex. The impression was "mild COPD with likely mild atelectatic and/or fibrotic changes." (Tr. 638).

Bruder began physical therapy on September 17, 2015. (Tr. 632). The long terms goals of the physical therapy were to eliminate Bruder's pain in her pelvis, thighs, and her lumbar and

thoracic spine. Bruder also reported pain in her ankles and feet joints. She had abnormal posture and joint stiffness. Bruder rated her pain as 8/10 and had pain radiating from her back down her legs, worse on the left. She complained of poor sleep and that she was "losing [her] urine a little more often here lately." (Tr. 633). On October 6, 2015, Physical Therapist Dave Moore performed a slump test to measure pain and range of motion in Bruder's cervical spine. The results were "very +" with reduced range of motion. She also had positive straight leg raise tests and limited range of motion in her legs. The range of motion in Bruder's hips was also very limited in all directions. An attempted standing flexion test showed 70-80% reduction of range of motion in Bruder's lower back with an immediate increase in lower back pain. Bruder's gait was antalgic. Bruder was doing light walking as prescribed but could only tolerate three minutes. (Tr. 633).

An x-ray of Bruder's cervical spine on November 18, 2015 showed minimal degenerative changes at C5-C6. Specifically, there were minimal inter-space narrowing and minimal hypertrophic spurs in and between the C5-C6 discs with minimal neural foraminal encroachment. (Tr. 639).

On November 6, 2015, Bruder saw orthopedic surgeon, Dr. Don Moore, from the Cleveland Clinic. (Tr. 1475). Bruder rated her pain as 8/10 and described it as achy, pins and needles, numbing, stabbing, and constant. (Tr. 1476). Dr. Moore opined that Bruder was not a candidate for surgery. He diagnosed chronic pain syndrome and recommended that she pursue a chronic pain rehabilitation program. (Tr. 1479-1450, 1557). Bruder began this program at the Cleveland Clinic on August 25, 2016. (Tr. 1771). Her prognosis was noted as "good." (Tr. 1773).

5

Dr. David Stadnick evaluated Bruder on April 12, 2016. At that time, Bruder was complaining of multiple musculoskeletal areas of pain. (Tr. 1697). She had elbow tenderness with mild triceps tenderness but no hand or finger abnormalities. She had a bunion on her foot with some lower extremity weakness. X-rays of her ankles and toes were normal and there was no evidence of arthritis. (Tr. 1699). Dr. Stadnick opined that there was no evidence of systematic autoimmune rheumatic disease. (Tr. 1670). He diagnosed bilateral lateral epicondylitis, bilateral de Quervain's tendinitis, and, based on Bruder's history, felt that there were signs or evidence of motor nerve impingement in the lumbar spine. (Tr. 1699).

In July 2016, Bruder was diagnosed with a herniated disc. (Tr. 1720). However, a radiology report from July 14, 2016 diagnosed only mild disc disease at L3-4 and L4-5, mild facet arthropathy with no significant central canal narrowing and a small posterior left synovial cyst. (Tr. 1725). An EMG in July 2016 showed remote L5 radiculopathies bilaterally, with no evidence of myopathy or lumbar plexopathy. (Tr. 1569).

Bruder saw Dr. Browne on September 21, 2016 with complaints of back and leg pain. (Tr. 1743). Dr. Browne diagnosed acute left-sided low back pain and left-sided sciatica and lumbago. (Tr. 1745)

    **B.    Opinion Evidence**

        **1.    Consulting Physician - Dr. David Stadnick, July 1, 2016**

At the request of Bruder's treating physician, Dr. Browne, Dr. David Stadnick evaluated Bruder in April 2016. On July 1, 2016, he completed a medical source statement regarding Bruder's physical capabilities. (Tr. 1566-1567). He opined that she could lift five pounds occasionally and three pounds frequently. She could frequently crawl, occasionally balance stoop, and rarely climb, crouch and kneel. (Tr. 1566). She could occasionally reach, push/pull,

and use fine and gross manipulation. She had moderate pain and would need two hours of unscheduled breaks during the workday. (Tr. 1567).

### 2. State Agency Reviewing Physicians

Rannie Amiri, M.D. reviewed Bruder's records on July 6, 2015 and determined that she was capable of occasionally lifting or carrying 20 pounds and frequently carrying or lifting 10 pounds. She could sit, stand and/or walk for 6 hours in an eight-hour workday. She could frequently climb ramps and stairs; climb ladders, ropes and or scaffolds; and crawl. She was unlimited in her ability to balance, kneel and crouch. Dr. Amiri opined that Bruder did not have any manipulative limitations. (Tr. 374-375)

William Bolz, M.D., reviewed Bruder's records on November 10, 2015 and affirmed the opinions stated by Dr. Amiri. (Tr. 392-393)

### C. Testimonial Evidence

### 1. Bruder's Testimony

Bruder was forty-eight at the time of the hearing. (Tr. 310). She lived in an apartment with her husband who had been diagnosed with lung cancer. (Tr. 310-311). She graduated from high school and received vocational training as a secretary and as a beautician. (Tr. 314). She was enrolled in the Army Reserves after school but was medically discharged before completing her tour of service. Bruder was a smoker but she was trying to reduce the amount that she smoked. (Tr. 348).

Bruder's past work was considered to be assistant retail manager, apartment house manager, retail store manager and retail store clerk. (Tr. 317, 318, 350-355).

Bruder testified that she was injured at work causing a disc bulge in her back and a cyst on her spine. She was having difficulty functioning and fell often. She used a cane to ambulate.

(Tr. 319). She did very little around her apartment. Her husband did the household chores, including the laundry. (Tr. 345). She no longer drove and relied on her husband to take her to appointments. (Tr. 312-313).

## 2. Vocational Expert Testimony

Vocational Expert ("VE") Shaw Bacher also testified at the hearing. (Tr. 349-356). The VE testified that an individual who had the residual functional capacity for sedentary work; who required an assistive device for standing and walking; could occasionally climb ramps and stairs; could not climb ladders, ropes or scaffolds; could occasionally balance and stoop; could not kneel, crouch or crawl; needed to avoid all exposure to hazards and concentrated exposure to pulmonary irritants; could not drive commercially; could frequently handle and finger; could occasionally reach overhead bilaterally; could perform simple, routine and repetitive tasks but not at a production-rate pace, such as an assembly line; could adapt to frequent routine changes in the workplace that were easily explained; and who could interact frequently with supervisors, coworkers, and the general public would not be able to perform Bruder's past work of retail store manager or assistant retail store manager. (Tr. 351-352). However, such an individual would be able to perform the jobs of document addresser, order clerk, and surveillance system monitor. And, there were significant numbers of these jobs nationally. If the individual could only occasionally handle and finger, she would still be able to perform the job of surveillance system monitor, but not the jobs of document addresser and order clerk. (Tr. 353). The individual would not be able to perform these jobs if she consistently missed two times per month. (Tr. 354).

## IV. The ALJ's Decision

The relevant portions of the ALJ's decision (Tr. 164-175) are paraphrased as follows:

8

3. Through the date last insured, Bruder had the following severe impairments: degenerative disk disease at L3-5, and T12-L1, with perineural cyst; a bipolar disorder; anxiety; and osteoarthritis. (Tr. 166)

5. Through the date last insured, Bruder had the residual functional capacity to perform sedentary work except she: could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; could occasionally balance and stoop; could never kneel, crouch, or crawl; must avoid all exposure to hazards; could not drive commercially; could frequently handle and finger; could occasionally/never reach overhead bilaterally; must avoid concentrated exposure to pulmonary irritants such as dust, odors and fumes; could understand, remember, and carry out simple instructions; could perform simple, routine, and repetitive tasks, but not at a production-rate pace such as on an assembly line; could adapt to infrequent routine changes in the workplace that could be easily explained; could interact frequently with supervisors, coworkers and the general public, and required an assistive device for standing and walking. (Tr. 169-174)

10. Through the date last insured, considering Bruder's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform. (Tr. 174-175)

Based on her findings, the ALJ determined that Bruder had not been under a disability from April 8, 2015, the alleged onset date, through September 30, 2016, the date last insured. (Tr. 175)

V. **Law & Analysis**

A. **Standard of Review**

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d

234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the claim using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden shifts to the agency to show that there are a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Functional Capacity Examination by Matthew Hamlin, PT

Bruder contends that the ALJ erred by assigning great weight to the FCE completed by Physical Therapist Matthew Hamlin but then not adopting all of the opinions expressed in the FCE. ECF Doc. 15 at Page ID# 1854-1856. Regarding the FCE, the ALJ stated:

> Turning to the opinion evidence, in May 2015, during a Functional Capacity Examination, Matthew Hamlin, PT, opined that the results indicated that the claimant gave maximal levels of effort with the tests involved in the functional capacity evaluation, and the claimant demonstrated physical abilities that match the sedentary work level. (Exhibit 32F at 2-15). Because a physical therapist does not qualify under the definition of "acceptable medical source," as defined in 20 CFR § 404.1513 and § 416.913, the opinion is, pursuant to 20 CFR § 404.1527 and § 416.927, not a "medical opinion." Nevertheless, I have given Matthew Hamlin's opinion great weight as it is consistent with the medical record as a whole, it provides insight into the severity of the claimant's impairments and how they affect her ability to function, and it has been accounted for in the residual functional capacity with a limitation to the sedentary exertional level.

(Tr. 172). The ALJ correctly noted that Matthew Hamlin was not an acceptable medical source. Consequently, his opinions could not be entitled to controlling weight. "An ALJ must consider other-source opinions and 'generally should explain the weight given to opinions for these 'other sources[.]'' [SSR 06-03p at 6, 2006 SSR LEXIS 5.] But other-source opinions are not entitled to any special deference." *Hill v. Comm'r,* 560 F. App'x. 547, 550 (6th Cir. 2014).

Bruder argues that the ALJ erred by "cherry-picking" from the FCE and only adopting portions of it into the RFC. Bruder's argument is not well taken. PT Hamlin's opinion was not entitled to controlling weight. Bruder has not cited, nor is the court aware of, any legal authority requiring the ALJ to adopt, verbatim, an "other source's" opinion. The ALJ explained that he gave great weight to Hamlin's opinion and accounted for it in the RFC by limiting Bruder's abilities to sedentary jobs. Bruder has not cited any legal standard that the ALJ incorrectly applied in weighing the opinion of Mr. Hamlin.

In essence, Bruder complains that the ALJ's explanation of his reasons for not adopting all of PT Hamlin's opinions fell short. But, SSA regulations did not require the ALJ to give good reasons – or any reasons – for not endorsing all of the opinions of a non-treating source. Further, here, the ALJ did not stand mute on the topic; he explained that it was Hamlin's opinion that led to the conclusion that Bruder could only work at sedentary-level jobs. The ALJ was not obligated to say anything more in respect to an unacceptable source opinion. Indeed, the ALJ pointed out that Hamlin's views didn't qualify as a "medical opinion." Bruder has cited no cases indicating more was required of the ALJ under the circumstances, and no error was committed in respect to this part of the ALJ's decision.

### C. Dr. Stadnick's Opinion

Similarly, Bruder contends that the ALJ erred by not adopting all of the limitations expressed in the opinion of Dr. David Stadnick.[1] ECF Doc. 15 at Page ID# 1856-1857. Regarding Dr. Stadnick's opinion, the ALJ stated:

> In July 2016, David Stadnick, M.D., opined that the claimant could occasionally lift or carry 5 pounds, frequently lift or carry 3 pounds, requires additional unscheduled rest periods, and can rarely kneel, crouch, or climb. (Exhibit 27F). I have given Dr. Stadnick's opinion great weight as it is consistent with the medical record as a whole, it provides insight into the severity of the claimant's impairments and how they affect her ability to function, and it has been accounted for in the residual functional capacity with a limitation for the sedentary exertional level.

(Tr. 172-173)

The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In determining disability, an ALJ evaluates the opinions of medical sources in accordance with the

---

[1] Bruder refers to this medical source as "Dr. Chadwick." However, the medical records and the ALJ's decision both identify this medical provider as Dr. Stadnick. (Tr. 172, 1697-1700)

13

nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The Code of Federal Regulations describes how medical opinions must be weighed:

> (c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
>> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>>
>> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. ...
>>
>> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion . . ..
>>
>> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>>
>> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
>> . . .

20 CFR § 416.927(c).  See also 20 CFR § 404.1527(c).  Here, there was no medical opinion from a treating source.  Dr. Stadnick was not a treating source because he only saw Bruder once for an evaluation.  *See Kornecky v. Comm'r Soc. Sec.,* 167 F. App'x 496, 506-07 (6th Cir. 2006).  Nonetheless, the ALJ assigned great weight to his opinion and limited Bruder's RFC to sedentary jobs.

Bruder cites no legal authority requiring the ALJ to adopt every opinion expressed by a consulting physician.  The ALJ was not required to incorporate into the RFC all of the limitations expressed in Dr. Stadnick's opinion.  And, he was not required to apply the treating physician rule to Dr. Stadnick's opinion because Bruder only met with this physician once.  *See Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 730 (6th Cir. 2013), *citing Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).

### D. Failing to Explain Weight Assigned to PT Hamlin's FCE and Dr. Stadnick's Opinion

Bruder complains that the ALJ did not explain why he did not accept all of the limitations stated in the FCE and Dr. Stadnick's opinions in the face of giving their views "great weight." But, as already stated, Matthew Hamlin, P.T., and Dr. David Stadnick were not treating sources. Because of that, the ALJ was not obligated to state "good reasons" for not accepting all of their views.  The Social Security regulation setting forth the standards for evaluating medical source opinions and opinions for non-medical sources and unacceptable medical sources, 20 C.F.R. § 404.1527 makes it clear that the ALJ is only required to give good reasons for deciding not to give controlling weight to a treating source opinion.  And while that same regulation requires the ALJ to consider all opinions – even those from unacceptable and non-medical sources – using the same evaluation standards applicable to the review of treating source opinions, it does not impose a "good reasons" requirement when the ALJ adopts some but not all of the opinions of a

15

non-treating source. Here, there can be no question that the ALJ gave consideration to the opinions of PT Hamlin and Dr. Stadnick. He used those opinions to find a more restrictive RFC than was found by state agency reviewing doctors. The ALJ could have said more about why he didn't adopt all of their findings, but he was not *required* to do so.

Bruder offers the following purported quote from *Young v. Comm'r of Soc. Sec.,* 351 F. Supp.2d 644, 649 (E.D. Mich. 2004): "[t]he ALJ cannot "pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale for his decision." ECF Doc. 15 at Page ID# 1857. Unfortunately, this is not what the *Young* court actually said. *Young* stated: "[n]either this Court nor the ALJ "may [] focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence." *Young,* 351 F. Supp. at 649, citing *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). Bruder's ALJ did not base his decision on a single piece of evidence while ignoring others. He expressly considered the opinions of Mr. Hamlin and Dr. Stadnick and limited his RFC finding to a sedentary exertion level based on their opinions. Bruder's characterization of the holding of *Young* is unpersuasive because the ALJ has complied with what that case actually says. And Bruder has not cited Sixth Circuit authority for the proposition that an ALJ must recite detailed reasons for not adopting every opinion of a non-treating source or say anything at all about an unacceptable source. Ironically, had it not been for the ALJ's handling of the Hamlin and Stadnick opinions, he might have found Bruder capable of light exertion-level work, as found by the state agency reviewing doctors. (Tr. 173). Bruder's argument that the ALJ failed to provide sufficient reasons for not adopting all of the views of Mr. Hamlin and Dr. Stadnick is not well taken.

### E. Failing to Explain how Bruder's Daily Activities Exceeded her Symptoms

Finally, Bruder argues that the ALJ failed to explain his statement that Bruder "has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 173); ECF Doc. 15 at Page ID# 1860-1861. This part of the ALJ's decision related to his assessment of the credibility of Bruder's statements concerning her impairments. He stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> The claimant has described daily activities which are not limited to the extent one would expect given the complaints of disabling symptoms and limitations. Although the claimant has received treatment for the allegedly disabling impairments, the treatment has been essentially routine and conservative in nature, and it was noted that the claimant is not a surgical candidate. The claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in the claimant's favor, but the medical records reveal that the medications have been relatively effective in controlling the claimant's symptoms.

(Tr. 173-174). Bruder argues that the ALJ was required to explain the activities that he found inconsistent with her "exaggerated symptoms." ECF Doc. 15 at Page ID# 1860. But the Sixth Circuit has affirmed credibility assessments providing similar explanations. *See Sims v. Comm'r of Soc. Sec.,* 406 F. App'x 977, 981 (6th Cir. 2011). Here, as in *Sims*, the ALJ did not completely reject Bruder's statements but only partially credited them. Earlier in his decision, the ALJ referred to Bruder's Adult Function Report which indicated that she was able to drive a car, count change, follow written and spoken instructions, spend time with others, talk with her family on the phone, had no problems getting along with family, friends and neighbors, could pay attention for 5-10 minutes, and could dress herself, bathe, care for her hair, shave and feed

herself. (Tr. 168). The ALJ also referred to the state agency psychiatric reviewer's opinion that Bruder had no restrictions in daily activities. (Tr. 169). Thus, substantial evidence supported the ALJ's evaluation of Bruder's subjective symptom complaints.

Citing *Kalmbach v. Comm'r of Soc. Sec,* 409 F. App'x 852, 864 (6th Cir. 2011) and *Lorman v. Comm'r of Soc. Sec.* 107 F. Supp. 3d 829, 838 (S.D. Ohio 2015), Bruder asserts that the ALJ was required to compare the disputed activity to an eight-hour work day activity. But the facts of this case differ from those in *Kalmbach* and *Lorman.* For example, in *Kalmbach,* the Sixth Circuit found that the ALJ did not properly analyze the claimant's subjective complaints of pain. There was substantial evidence in the record contradicting the ALJ's finding that the claimant engaged in normal daily and social activities. Conversely, substantial evidence from Bruder's record supported the ALJ's determination that Bruder was capable of performing less than a full range of sedentary work. And the VE testified that there were jobs available for an individual with Bruder's RFC.

Bruder argues that her statements regarding her daily activities were consistent with her other statements that she was not able to put on her own socks, drive, use a shower without a shower chair and perform household chores. ECF Doc. 15 at Page ID# 1860. But, "[i]f the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion." *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012), citing *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). The court must defer to the ALJ's credibility assessment and, even if the ALJ could have better explained his assessment, or reached the opposite conclusion, reversal is not warranted unless there was no substantial evidence supporting the decision. Here, there was substantial evidence supporting the ALJ's credibility assessment and it must be affirmed.

18

## VI. Conclusion

The ALJ properly analyzed the evidence, including opinions from Bruder's medical and other sources, and concluded that she was not disabled during the relevant time period. Because the ALJ's decision was supported by substantial evidence and because Bruder has not identified any incorrect application of legal standards, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: December 6, 2018

Thomas M. Parker
United States Magistrate Judge